**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|   |   |   |
|---|---|---|
| Bailey Wooten, | : | |
| | : | **Case No. 2:25-cv-00256** |
| Plaintiff, | : | |
| | : | **Judge Graham** |
| v. | : | |
| | : | **Magistrate Judge Vascura** |
| Tara Sturts, et al, | : | |
| | : | |
| Defendants. | : | |

## OPINION & ORDER

This matter is before the Court upon Plaintiff Bailey Wooten's ("Plaintiff") objections (doc. 24) to the Magistrate Judge's Report and Recommendation ("R&R") (doc. 23), the motion of the Morrow County Defendants[1] for judgment on the pleadings (doc. 63), as well as various additional motions. For the reasons set forth below, the Court disposes of the pending motions as follows:

- Plaintiff's Objections are **OVERRULED**, and the Court **ADOPTS** the R&R. Doc. 24; doc. 23.
- Defendants' motion for judgment on the pleadings is **GRANTED**. Doc. 63.
- Defendants' motion to strike Plaintiff's (second) response in opposition is **GRANTED**. Doc. 72.
- Plaintiff's motion for leave to file a second amended complaint is **DENIED** as futile. Doc. 22.
- Plaintiff's motion for leave to file a supplemental complaint, which the Court construes as another motion for leave to amend, is **DENIED** as futile. Doc. 41.

---

[1] Namely, Morrow County Job and Family Services ("MCJFS"), Morrow County Sheriff's Department ("MCSD"), Morrow County Prosecutor's Office ("MCPO"), Morrow County, Ohio, and Morrow County employees Tara Sturts, Daniel Dowell, Chris Jones, Noelle Parrish, and Kylie Ehrhart.

- Plaintiff's remaining motions are **DENIED** as moot. *See* doc. 33; doc. 45; doc. 49; doc. 68.

## DISCUSSION

This case centers on state juvenile court proceedings which involved the temporary removal of Plaintiff's son, A.W., from her custody and his placement in certain juvenile residential treatment facilities. Under various theories, Plaintiff seeks redress from over a dozen defendants alleged to have been somehow culpably involved with the removal of A.W. Upon the initial screening of the first amended complaint (doc. 8), the Magistrate Judge recommended that all Defendants be dismissed from this suit with the exceptions of Defendants Chris Jones and Tara Sturts. Doc. 23.

While the R&R as to the first amended complaint was pending, Plaintiff filed a motion for leave to amend a second time (doc. 22), which the Magistrate Judge recommended be denied, finding that such amendment would be futile. *Id.* Plaintiff filed timely objections to all the Magistrate Judge's adverse recommendations. Doc. 24.

In further developments, Plaintiff has since filed a motion to add a "supplemental complaint" (doc. 53-1), which the Court construes as a motion to amend for the third time, and an answer was filed on behalf of all the Morrow County Defendants (doc. 47). In addition to their answer, Defendants have also filed a motion for judgment on the pleadings (doc. 63) and have submitted their opposition to Plaintiff's motion to file a supplemental complaint (doc. 60). Plaintiff has also

[2]

submitted additional materials—including video and audio evidence—as have the Defendants in their answer. As such, this matter is in the early procedural posture of the dismissal stage, but with unusually abundant record materials[2] and thrice-amended pleadings.

The Court will address the Magistrate Judge's findings and Plaintiff's objections thereto in the same sequence in which they were addressed in the R&R. As part of this review, the Court will consider whether Plaintiff's proposed amendments would save any of her claims (or plausibly allege any new claims). Then, the Court will address Defendants' motion for judgment on the pleadings. Ultimately, the Court concludes that Plaintiff's objections are without merit, that her proposed amendments would be futile, and that Defendants are entitled to judgment on the pleadings.

## STANDARD OF REVIEW

Pursuant to the Federal Magistrate Judges Act this matter was referred to a magistrate judge for an initial screening to determine if the complaint or any portion thereof must be dismissed. 28 U.S.C. § 636. A complaint filed in forma pauperis "shall" be dismissed if it "is frivolous or malicious[,] fails to state a claim on which relief can be granted[, or] seeks monetary relief against a defendant who is immune

---

[2] Plaintiff has expressly indicated her intent to incorporate her exhibits into her pleadings. *See, e.g.,* doc. 22-1, # 687 (Second Amended Complaint stating that exhibits A-RR are "attached or on record as part of this filing."). *See also* Fed. R. Civ. P. 10(c); *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) ("[A] document that is not formally incorporated by reference or attached to a complaint may still be considered part of the pleadings … when [the document] is central to the plaintiff's claim" (quotation omitted)). Regardless, the conclusions herein do not turn on whether or not the Court considers any particular exhibit submitted by either party.

from such relief." 28 U.S.C. § 1915(e)(2). Either party may file objections within fourteen days of the issuance of a report and recommendation of the magistrate judge. 28 U.S.C. § 636. The Court must then "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* The Court shall adopt any recommendations to which the parties do not object except "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *Id.*

To properly state a claim upon which relief may be granted, a plaintiff must satisfy the basic federal pleading requirements set forth in Federal Rule of Civil Procedure 8(a). *See also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (applying Federal Rule of Civil Procedure 12(b)(6) standards to review under 28 U.S.C. §§ 1915A and 1915(e)(2)(B)(ii)). Under Rule 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, Rule 8(a) "imposes legal and factual demands on the authors of complaints." *16630 Southfield Ltd., P'Ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013).

Thus, "a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Consequently, a complaint that consists of "labels and conclusions" or "a

[4]

formulaic recitation of the elements of a cause of action" is insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 555). "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *Flagstar Bank*, 727 F.3d at 504 (citations omitted). Further, the Court holds pro se complaints "to less stringent standards than formal pleadings drafted by lawyers." *Garrett v. Belmont Cty. Sheriff's Dep't*, 374 F. App'x 612, (6th Cir. 2010) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). However, courts are not required "to guess at the nature of the claim asserted." *Frengler v. Gen. Motors*, 482 F. App'x 975, 976–77 (6th Cir. 2012) (quoting *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).

As noted above, the Court will first address the R&R, which disposed of the bulk of the claims, and Plaintiff's objections thereto, as well as her proffered amended pleadings, followed by the Morrow County Defendants' motion for judgment on the pleadings.

## I. The Initial Screen of Plaintiff's Pleadings and Her Subsequent Objections

Plaintiff objects to all the Magistrate Judge's recommendations dismissing claims and Defendants. For the reasons that follow, the Court adopts the recommended disposition of Plaintiff's pleadings and overrules her objections. To be clear, the Court reviews the pleadings *de novo*, and the analysis is further distinct from that of the Magistrate Judge because it includes consideration of Plaintiff's subsequent proffered amendments to determine whether such amendments would

save the claims from dismissal. Thus, the Court's conclusions include the determination that such amendments would be futile.

A. **Plaintiff Fails to State a Claim Against the County Defendants (and all Defendants in their Official Capacities).**

Plaintiff objects to the Magistrate Judge's determination that Plaintiff has failed to state a claim against Defendants MCJFS, MCSD, and MCPO. Upon *de novo* review, the Court reaches the same conclusion and thus will adopt the recommendation of the Magistrate Judge. Additionally, the Court extends this conclusion to all government agency Defendants as well as all Defendants in their official capacities.[3]

A viable § 1983 claim against a governmental entity must allege (1) a constitutional violation, which (2) was directly caused by a governmental policy or custom. *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017). As to the latter, "[t]here are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). A plaintiff may prove that a defendant has an actionable, unconstitutional "policy" or "custom" in place by demonstrating: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision[-]making authority ratified illegal actions; (3) the existence of a policy of

---

[3] "[I]ndividuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Accordingly, "[a] suit against an individual in his official capacity is the equivalent of a suit against [that] governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 68 (1989)). Therefore, the analysis is the same.

inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas*, 398 F.3d at 429).

Plaintiff's Amended Complaint states the following allegations against the County Defendants:

> 5. [MCJFS]: Engaged in unconstitutional actions, including wrongful removal, failure to ensure medical care, and misuse of child support enforcement to interfere with parental rights.
> […]
> 13. [MCSD]: Failed to investigate wrongful custodial interference.
> 14. [MCPO]: Ignored complaints and refused to investigate CPS misconduct.
> […]
> 17. State of Ohio, Morrow County: Failed to provide oversight over agencies engaged in unconstitutional actions.

Doc. 8, # 408-09. Pursuant to the initial screening, the Magistrate Judge concluded that "Plaintiff has not alleged any facts on which the Court could rely to conclude that an official policy or custom of Morrow County resulted in the violation of her constitutional rights." Doc. 23, # 701.

Though the Magistrate Judge's determinations were based on the Amended Complaint (Doc. 8), Plaintiff's objections refer to her Second Amended Complaint (doc. 22). Specifically, Plaintiff cites her allegation of "coordinated misconduct by state and county officials" in acts "involv[ing] all listed defendants acting with shared purpose and mutual support." Doc. 24, # 715. She then proceeds to list what she purports to be evidence of the pattern of misconduct. *Id.* Plaintiff alleges

[7]

policies/customs such as, "Systemic Obstruction of Records Access (Policy/Custom of Concealment)," "Systemic Failure to Investigate Misconduct and Acquiescence," "Policy/Custom of Unlawful Removal and Reliance on Unsubstantiated Claims," and "Systemic Neglect of Medical/Dental/Vision Care & Improper Placements." *Id.* at # 715-18.[4]

1. *Systemic Obstruction of Records Access*

To support her allegation of "Systemic Obstruction of Records Access," Plaintiff cites to a letter she received in response to a public records request. *Id.* at # 715 (citing doc. 14-2). She alleges that the letter "explicitly states a policy of withholding 'communications with law enforcement' as confidential," which demonstrates "a systemic practice of selective disclosure that obstructs due process." *Id.* But Plaintiff's allegation is merely conclusory, and declaring a perceived constitutional violation is not the same as plausibly alleging a legally cognizable one. She has not pleaded facts supporting her claim that "selective disclosure" (i.e., *any* limitation on records disclosure) amounts to a constitutional injury.

2. *Systemic Failure to Investigate Misconduct and Acquiescence*

To support her allegation of "Systemic Failure to Investigate Misconduct and Acquiescence," Plaintiff cites to her many allegations of misconduct, noting that she "formally complained" to the MCPO and MCSD "regarding alleged custodial

---

[4] To be clear, Plaintiff articulates her allegations in this form in her objections to the R&R, rather than her pleadings. But because Plaintiff can articulate no viable *Monell* claim (across any iteration of her pleadings), the Court need not consider whether her pleadings provided sufficient notice of the claims she articulates more fully in her objections.

interference." Doc. 24, # 715-16 (citing "PAGE ID #441, 443, 445, 446, 447, BB1.pdf").[5]
The Court understands Plaintiff to be alleging what courts often refer to as an
"inaction theory"; i.e., that the County Defendants tolerate federal rights violations
as a matter of custom which is "unwritten but nevertheless entrenched." *Thomas*, 398
F.3d at 429. Plaintiff must show four elements to state a colorable *Monell* claim under
the inaction theory: (1) "a clear and persistent pattern" of rights violations; (2) "notice
or constructive notice on the part of the defendant"; (3) Defendants' "tacit approval of
the unconstitutional conduct, such that their deliberate indifference in their failure
to act can be said to amount to an official policy of inaction"; and (4) a causal link
between the custom and the constitutional deprivation. *Thomas*, 398 F.3d at 429
(quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

Plaintiff has not established a clear and persistent pattern of rights violations.
Again, she appears to rely entirely on her own emails to various officials, in which
she "consistently reminded them they have laws to follow," and which therefore
demonstrate, according to Plaintiff, "a pattern of alleged non-compliance that was
brought to their attention." Doc. 24, # 716. "[T]he mere existence of complaints,
without more, is not sufficient evidence to allow a reasonable jury to find the existence
of a clear and persistent pattern of illegal activity." *Stanfield v. City of Lima*, 727 F.
App'x 841, 852 (6th Cir. 2018). To the extent that complaints could provide *any*

---

[5] As is an unfortunate pattern in Plaintiff's filings in this case, these citations are plainly
wrong. Rather than showing "formal complaints" to the MCPO and MCSD, these PAGEID
numbers refer to: a records request sent to a MCJFS administrator (# 441), a response to the
records request, provided by Defendant Ehrhart (# 443), a screenshot appearing to show the
licensing status of a residential provider (# 445), a certification of another residential provider
(# 446), and the safety plan implemented on March 23, 2024 (# 447).

nominal evidence of the misconduct alleged, the Court finds that the weight is lessened here because all the complaints are lodged by the same individual, in addition to being duplicative in other respects. Plaintiff has not plausibly alleged *Monell* liability based on an inaction theory.

### 3. Policy/Custom of Unlawful Removal and Reliance on Unsubstantiated Claims.

Plaintiff next alleges a "Policy/Custom of Unlawful Removal and Reliance on Unsubstantiated Claims." Doc. 24, # 716. She does not allege this to be an official policy or legislative enactment. Among the four avenues of establishing *Monell* liability, Plaintiff's allegation appears most in line with an inadequate-training theory or an inaction theory. Regardless, either theory requires "a clear and consistent pattern" of rights violations, which Plaintiff has not established. *Thomas*, 398 F.3d at 429.

Plaintiff contends that her son, A.W., was removed "without a valid court order" and that she "never signed a case plan with CPS[6]." Doc. 24, # 716. She further contends that MCJFS continued to consider "family violence" despite the county magistrate's dismissal of the abuse and neglect case arising from the incident which also led to A.W.'s removal. *Id.* at 717. As discussed below, Plaintiff's attacks on the juvenile court proceedings are fundamentally meritless. Regardless, even if all such allegations were true, and even if such allegations amounted to a constitutional injury, Plaintiff still has not described the basis of a *Monell* claim. She asserts that the alleged conduct "demonstrates a pattern of relying on unproven or judicially

---

[6] The Court understands Plaintiff's use of "CPS" to refer to MCJFS.

dismissed allegations and acting beyond jurisdiction." *Id.* But saying it doesn't make it so, and a single instance of allegedly unconstitutional conduct does not, as a matter of law, evince a broader pattern of the same. *See Thomas*, 398 F.3d at 434 (one must "reach beyond the facts of [the instant case] to show any possibility of a pattern.").

Plaintiff also refers to Defendant Chris Jones being suspended in April 2024, claiming that his underlying conduct warranting the suspension "evidences a systemic issue of neglect and non-compliance within MCJFS." Doc. 24, # 717. Same as above: even assuming this allegation is true,[7] and that Chris Jones was suspended for conduct which proximately caused a constitutional injury to Plaintiff,[8] this would still only describe a single instance, which is insufficient for alleging a "clear and consistent pattern" of rights violations. *Thomas*, 398 F.3d at 429. Furthermore, to the extent Plaintiff is training her sights on county-level liability, an allegation that the county responded to employee misconduct with a disciplinary suspension is a stark

---

[7] Again, Plaintiff's citations do not support her argument. She cites "(ECF No. 14-11 PAGE ID #1, NOV20CHRISSUSPENSIONATTATCHMENT.pdf)" for ostensible support for the allegation that Chris Jones was suspended, yielding none. Doc. 24, # 717. On the case docket, doc. 14-11 (attached to Plaintiff's first amended complaint) contains the summons forms for defendants named in this action. The first page of the document is a summons directed at Terry R. Jones. The "PAGEID" descriptor normally refers to pages within the sequence of all documents filed in the case. Ergo, "PAGE ID #1" would refer to the first page of the first document filed in this case, a document entirely separate from the one Plaintiff appears to cite (doc. 14-11, which begins on PAGEID # 516). In any event, neither document indicates anything whatsoever about Chris Jones being suspended. Plaintiff's second amended complaint purports to list all of the exhibits she has submitted, with no mention of this pdf.

[8] Plaintiff has not alleged that Jones was suspended for his allegedly unconstitutional conduct toward *her*. Rather, Plaintiff asserts that he was suspended "for 'insubordination by refusing to perform assigned work or to comply with the written or verbal instructions of a supervisor' and 'wanton or willful neglect in the performance of assigned duties,' including 'documentation functions.'" Doc. 24, # 717. Again, despite Plaintiff's inclusion of apparent direct quotations, no such quotations appear in the record (to the Court's knowledge), and certainly not in the citation to which Plaintiff attributes them.

contrast to "tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction." *Thomas*, 398 F.3d at 429 (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

### 4. *Systemic Neglect of Medical/Dental/Vision Care & Improper Placements*

Plaintiff's allegation of a policy of "Systemic Neglect of Medical/Dental/Vision Care & Improper Placements" fares no better. For this theory, Plaintiff points to an instance when A.W. ran away from the group home in which he was placed by MCJFS. Plaintiff notes that A.W. was placed in the group home after being discharged from the hospital "without the recommendation of a treatment facility, and the doctor refused to give CPS the recommendation for a lock down facility [long] term." Doc. 24, # 718. The Court can find no authority for the proposition that a doctor's refusal to make a particular recommendation to a children's services agency amounts to a violation of the mother's constitutional rights. Even assuming that these allegations describe a constitutional violation, Plaintiff again alleges a single instance from which the Court cannot infer a pattern for the purposes of her *Monell* claim.

Plaintiff alleges that A.W. "did not receive regular dentist or eye appointments" during the approximately eight months that he was in state custody. *Id.* "Regular" is an important qualifier, as Plaintiff concedes that A.W. had at least one vision exam and a dental filling during that period but alleges that this represents a "significant gap" in his treatment. *Id.* But Plaintiff has not described anything at all "significant"

[12]

in a constitutional sense. Two medical appointments in an eight-month period does not "suggest[] a systemic failure to ensure basic medical needs are met for children in state care." *Id.*

In sum, the Court finds that Plaintiff has failed to state a *Monell* claim against the agency Defendants, as well as all Defendants in their official capacities.

## B.  Plaintiff Fails to State a Claim Against the Judicial Defendants.

The Magistrate Judge recommended that Defendant Tom Elkin, a state court judge, and Defendant Celeste Brammer, a magistrate (collectively, the "Judicial Defendants"), be dismissed on the basis of judicial immunity. Doc. 23. Plaintiff objects, contending that her allegations describe actions "outside the scope of protected judicial functions" or taken "in the complete absence of jurisdiction," which, she argues, would strip them of their immunity. Doc. 24, # 718-19. For support, Plaintiff cites to *Stump v. Sparkman*, 435 U.S. 349 (1978) and *Forrester v. White*, 484 U.S. 219 (1988), but these cases make clear that Plaintiff's allegations do not describe any actions fitting into either narrow exception to judicial immunity.

In *Stump*, the plaintiff sued a judge who had authorized a surgical sterilization procedure performed on the plaintiff when she was a minor. 435 U.S. at 351. The plaintiff alleged that the judge's approval of a petition for the sterilization procedure was "not a judicial act because the petition was not given a docket number, was not placed on file with the clerk's office, and was approved in an *ex parte* proceeding without notice to the minor, without a hearing, and without the appointment of a guardian ad litem." *Id.* at 360. But the Supreme Court found "no merit" to plaintiff's

argument that the informality of the proceedings rendered the approval of the petition a nonjudicial act. *Id.* at 362-63. Rather, the Court found the action at issue to be a judicial act because it was a "type of act normally performed only by judges," and that it was performed by the defendant judge "in his capacity as a Circuit Court Judge." *Id.* at 362; *compare Forrester v. White*, 484 U.S. at 229 (no judicial immunity for judge's administrative act of demoting and firing probation officer).

In the instant case, Plaintiff alleges that the Judicial Defendants' "refusal to process" her criminal complaints alleging custodial interference was "an administrative function, not a judicial one." Doc. 24, # 719. But *Stump* directs this Court to consider the expectation of the parties in determining whether the judge was acting in a judicial capacity, "*i.e.*, whether they dealt with the judge in [his/her] judicial capacity." 435 U.S. at 362. Without knowing exactly what Plaintiff means by "refusal to process," this allegation appears to be rooted in Plaintiff's expectation that the Judicial Defendants *should* have processed her criminal complaints due to their capacity as judges.[9] Therefore, this allegation does not pierce absolute judicial immunity.

The same is true of Plaintiff's claim that her "filings were routinely dismissed without judicial review," and that she was "directed to wait in the hall" prior to hearings on the record. Doc. 24, # 720. She claims that her attempts to file documents

---

[9] Though Plaintiff levels this allegation at the Judicial Defendants, she cites to an email she sent to the sheriff's office. Doc. 24, # 719. It's unclear how the cited document creates any connection whatsoever between the "refusal to process" allegation and the Judicial Defendants against whom it is brought. Suffice to say that "absolute" judicial immunity does not fall away upon the allegation that a judge didn't do something that was requested of someone else.

"were rejected or denied," citing to "(ECF No. 21-8, PAGE ID #677, whitedoutfilings.pdf, which documents 'Denied filings for morrow county case.')" *Id.* But, again, Plaintiff's citation provides no support for her proposition. In doc. 21-8, PAGEID # 677 shows a document titled "MOTION TO CLARIFY COURT ORDERS AND TO PREVENT UNAUTHORIZED ENFORCEMENT OF CASE PLAN POST-CLOSURE." Doc. 21-8. The document says nothing about filings being denied, rejected, or "whitedout." The document does, however, seek judicial relief, and identifies "Judge Tom Elkin" in the caption. *Id.* at # 677-78. In other words, Plaintiff was clearly dealing with the Judicial Defendants in their judicial capacities.

So it is with Plaintiff's assertion that immunity does not apply due to "procedural irregularities." Doc. 24, # 719. Specifically, Plaintiff claims that the proceedings were "irregular" because "[A.W.] had been taken on March 23, 2024, despite the complaint being filed on March 29, 2024, and an ex-parte hearing occurring on April 3, 2024, without Plaintiff's notice."[10] *Id.* Plaintiff cites no authority supporting her argument that the proceedings described were "irregular," let alone how such irregularities could remove absolute judicial immunity. Again, the cases that Plaintiff *has* cited foreclose the viability of her theory. For example, the plaintiff

---

[10] By definition, there is nothing "irregular" about the ex parte hearing occurring without notice to Plaintiff. *See* EX PARTE, Black's Law Dictionary (12th ed. 2024) ("Done or made at the instance and for the benefit of one party only, and without notice to, or argument by, anyone having an adverse interest[.]").

in *Stump* had a much stronger argument for "irregularity,"[11] in which the Supreme Court nevertheless found "no merit." 435 U.S. at 362-63.

Finally, nothing Plaintiff has alleged regarding the Judicial Defendants amounts to an act "taken in the complete absence of jurisdiction." Doc. 24, # 718. Plaintiff alleges that Defendant Brammer violated her due process rights when she decided "to grant the ex-parte order on insufficient and unreliable evidence... potentially acting in the complete absence of jurisdiction." *Id.* at # 719. The Supreme Court specifically—and emphatically—rejected this conception of judicial immunity in *Stump*: "A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." 435 U.S. at 359. Such immunity persists even if the action was done "maliciously" or in excess of the judge's authority. *Id.* at 356. In sum, Plaintiff has failed to plausibly allege an exception to absolute judicial immunity, and thus has failed to state a claim against the Judicial Defendants.

### C.   Plaintiff Fails to State a Claim Against Her Former Attorney.

The Magistrate Judge recommended dismissal of Plaintiff's claims against Defendant Donald Wick, her former attorney, because the Sixth Amendment right to effective assistance of counsel does not apply in civil proceedings. In her objections, Plaintiff appears to jettison her Sixth Amendment claim and instead suggests that "if Attorney Wick's actions or inactions were part of a conspiracy with state actors...

---

[11] The *Stump* opinion refers to "informality" (435 U.S. at 363) rather than "irregularity," but the underlying allegations, described *supra*, are of the same flavor as those raised by Plaintiff in the instant case.

he could be liable… as a private actor acting under color of state law."[12] Doc. 24, # 721. Plaintiff alleges that Wick discouraged her from filing certain motions and declined to act on many of her requests, which "suggests potential for concerted action with state actors." *Id.* But, again, saying it does not make it so. Plaintiff cannot repackage her meritless Sixth Amendment claim by simply asserting that the same facts "suggest[] potential" for an entirely different claim. "Imagined as possible" ≠ "alleged as plausible."

A pleading must allow the Court to draw "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *Flagstar Bank*, 727 F.3d at 504 (citations omitted). Plaintiff has simply not plausibly alleged that Wick was in a conspiracy with state actors, that he was acting under color of state law, or that he at all contributed to depriving Plaintiff of her constitutional rights.

### D. Plaintiff Fails to State a Claim Against the Facility Where her Child was Placed.

The Magistrate Judge recommended that Mohican Young Stars Academy (MYSA) be dismissed because Plaintiff has failed to state a claim upon which relief can be granted. Plaintiff objects to this conclusion, and has also added a claim (sort of) against Keeping Kids Safe (KKS), another residential facility at which A.W. was

---

[12] In her "supplemental complaint"—the most recent iteration of her pleadings—the only stated claim against Wick is her "RICO" claim alleged against "all" Defendants. Doc. 53-1, # 1410.

placed, where Plaintiff alleges he was "beaten, tattooed, and subjected to violence." Doc. 53-1, # 1408. In the most recent iteration of her pleadings, Plaintiff alleges that MYSA and KKS are liable under the RICO act based on an "ongoing pattern of activity involving mail fraud, wire fraud, falsification of records, and deprivation of rights under color of law to obtain federal funds and justify agency actions." *Id.* at # 1410. Plaintiff additionally alleges that MYSA and KKS are liable for Failure to Protect under the State-Created Danger Doctrine.[13] *Id.* Plaintiff has not plausibly alleged either claim against either Defendant.[14]

Start with KKS. The materials submitted by Plaintiff show that A.W. was placed in the care of KKS on October 1, 2024. Doc. 14-5, # 461. Emails among court personnel indicate that A.W.'s placement at KKS directly followed his hospitalization after two suicide attempts while in Plaintiff's care, and that Plaintiff "cooperated in signing all forms to transfer [A.W.]." Doc. 21-1, # 582. An incident report from KKS dated October 11, 2024, states that A.W. skipped school the day before, resulting in the loss of 100 points. Doc. 14-6, # 479. On October 16, 2024, A.W. walked out of KKS and did not return. Doc. 14-8, # 495. The police report reflects that, on October 17,

---

[13] Neither MYSA nor KKS are state actors, leaving a substantial hole in Plaintiff's state-created-danger theory which she makes minimal effort to close. *See* doc. 24, # 722 (arguing MYSA "could be liable as a state actor or a private entity acting in concert with state actors" because of the facility's acceptance of a MCJFS placement while unlicensed). This alone is sufficient to conclude that, as to these Defendants, Plaintiff has failed to plead a state-created-danger claim for which relief can be granted.

[14] Plaintiff does not name KKS under the list of "Parties" in her Supplemental Complaint (or in any of her three previous iterations of her pleadings) but she identifies KKS as a Defendant for her Failure to Protect claim (and identifies "all" as Defendants for her RICO claim). Doc. 53-1, # 1406-07; *Id.* at # 1410. Still, the Court analyzes it notwithstanding that technical defect.

2024, Plaintiff told the police department that A.W. had returned home. Doc. 1-21, # 97

Plaintiff alleges that "KKS staff abandoned [A.W.] in an unfamiliar area after he refused to enter their vehicle," and that the same staff member "later told Findlay Police she had not seen [A.W.] on her route, despite knowing his whereabouts." Doc. 53-1, # 1408. The materials indicate that Whitney Jones-Down, a KKS staffer, encountered A.W. walking down the street while she was on her way to KKS to meet with him and tried to get him to enter the car, but he ignored her, and she left. Doc. 1-21, # 89. According to the police report, a different staff member told the responding officer that "[A.W.] walked out of the residence to the west and none of the caretakers present were able to catch up with him." *Id.* at 95. Plaintiff appears to allege that Jones-Down's encounter with A.W. renders the second staffer's statement a falsehood. Regardless, Plaintiff does not allege any injury whatsoever from the alleged abandonment or false representation. Nothing in the record supports Plaintiff's conclusory claim that A.W. was "beaten, tattooed, and subjected to violence," at KKS, and nothing in the materials reflects conduct that could plausibly form the basis of a RICO action or a claim under the state-created danger doctrine. Plaintiff has not plausibly stated a claim against KKS.

The materials show that A.W. was admitted to MYSA on October 17, 2024, the same day that Plaintiff reported that he had returned home from KKS. Doc. 14-9, # 499. Plaintiff alleges that MYSA operated "without a valid residential license from September 9, 2024, until November 21, 2024," and that "[A.W.]'s entire placement fell

[19]

during this unlicensed period."[15] Doc. 53-1, # 1408. She further alleges that "[MYSA] staff used improper holds, allowed peer assaults, and exposed Aiden to riots requiring police and ambulance intervention." *Id.* Plaintiff does not offer any facts or argument connecting these allegations to any RICO claim. Plaintiff has not pleaded any connection between the alleged lapse of MYSA's operating license and any redressable injury. Plaintiff's list of vague grievances in her objections simply do not amount to a colorable claim against MYSA.[16]

### E.     Plaintiff Fails to State a Claim Against the Ohio Attorney General.

The Magistrate Judge recommended that the Ohio Attorney General ("OAG") be dismissed in the absence of "any authority for Plaintiff's assertion that the OAG is responsible for investigating reports of misconduct by county departments of jobs and family services." Doc. 23, # 704. In her objections, Plaintiff states that the OAG, "as the state's chief legal officer, has a responsibility to address serious allegations of misconduct by state agencies when formally notified." Doc. 24, # 723. Plaintiff cites no authority whatsoever for this assertion. To summarize, the Magistrate Judge rejected Plaintiff's premise because it lacked support, and Plaintiff objected by

---

[15] This statement is contradicted by materials in the record which indicate that A.W. was still at MYSA in December 2024 (doc. 14-10, # 505), and Plaintiff's own pleading describes A.W. being there from "October 17–December 17, 2024." Doc. 53-1, # 1408.

[16] For example, Plaintiff complains of MYSA's website referring to the facility as a "juvenile detention center" because that descriptor "directly contradicts its stated purpose as a residential treatment facility." Doc. 24, # 722. She claims that A.W. was housed with other juveniles "from 9 to 19" which "if true, would violate generally accepted juvenile facility standards." *Id.* She claims (without support) that he was assaulted by two juvenile inmates while at MYSA. *Id.* Plaintiff may well have legitimate frustrations about her son's treatment, but she has failed to translate such frustrations into a federal cause of action.

repeating the same premise without any support. The Court is not persuaded. Furthermore, to the extent that Plaintiff's theory is based on her allegations of unlawful removal, the record makes clear that such allegations are meritless. The OAG cannot be held liable for failure to investigate meritless allegations.

### F. Plaintiff Fails to State a Claim Against the Remaining Defendants.

Plaintiff objects "vehemently" to the Magistrate Judge's recommendation that Defendants Kylie Ehrhart, Deputy Daniel Dowell, and Nicole Parrish be dismissed. Doc. 24, # 724. The Magistrate Judge based her recommendation on lack of factual support for Plaintiff's "sparse allegations." Doc. 23, # 704. To the extent Plaintiff's objections and proffered pleadings provide any additional factual context, they only underscore the absence of any merit to Plaintiff's claims.[17]

#### 1. **Dowell**.

Start with Defendant Dowell, the officer responding to the March 23, 2024, incident. In Plaintiff's supplemental complaint, she alleges that Dowell "created a false 'non-offense' report, shut off body camera, forwarded report to CPS without justification, and retaliated against Plaintiff for protected speech… despite being told by both Plaintiff and [her paramour] that no altercation had occurred." Doc. 53-1, # 1407. Based on these facts, Plaintiff alleges that Dowell (1) violated her Fourth

---

[17] Furthermore, Defendants Jones' and Sturts' subsequent motion for judgment on the pleadings raises arguments which are equally applicable to (at least) Defendants Ehrhart and Parrish. As such, while the Court addresses these claims in the context of Plaintiff's objections to the R&R, the Court's disposition of the motion for judgment on the pleadings, *sub.*, § II, provides further relevant discussion.

Amendment right to be free from unreasonable seizure, and (2) retaliated against Plaintiff for "protesting law enforcement's treatment of partner." *Id.* at # 1410. As pleaded, her Fourth Amendment claim—Count III in the supplemental complaint—does not actually allege that *Plaintiff* was unreasonably seized. Rather, under this count, she alleges that Dowell "[r]emoved child from home without probable cause, exigent circumstances, or valid court order[,] detained Plaintiff's partner under coercive conditions," and "forwarded false police reports to CPS." *Id.* at # 1409. Plaintiff cannot bring a Fourth Amendment claim on behalf of her partner. And, as explained below, Plaintiff mischaracterizes the circumstances of A.W.'s removal from the home, which, regardless, cannot be attributed to Dowell.

Assuming Plaintiff intends to raise a Fourth Amendment claim based on her own arrest (as her filings suggest), she has not alleged facts supporting such a claim. "[A]rrest without a warrant does not violate the Fourth Amendment if probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988). Probable cause is established when "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Plaintiff is fundamentally incorrect when she states, in her objections, that "If, as Plaintiff asserts, no altercation occurred, then Deputy Dowell's report of one, his observation of injuries, and his subsequent arrest of Plaintiff were without probable

cause." Doc. 24, # 725. "A valid arrest based upon then-existing probable cause is not vitiated if the suspect is later found innocent." *Criss*, 867 F.2d at 262. Thus, Plaintiff cannot create a factual dispute to survive dismissal simply by asserting her innocence.

Plaintiff repeatedly cites to her and her paramour's denial of any physical altercation to Dowell, and her theory that such denial had the legal effect of prohibiting Dowell from considering any other circumstances, including substantial evidence to the contrary.[18] This is plainly contrary to Sixth Circuit precedent. *See Harvey v. Carr*, 616 F. App'x 826, 829 (6th Cir. 2015) (quoting *Painter v. Robertson*, 185 F.3d 557, 571 n. 21 (6th Cir.1999)) ("Officers [need not] 'conduct [pre-arrest] quasi-trials' whenever an investigative target 'asserts a purported legal excuse for his actions.'")[19] Plaintiff's allegations as to Dowell simply do not describe a recognizable Fourth Amendment violation.

---

[18] For example, the incident report recites statements corroborating the altercation from Plaintiff's mother and Plaintiff's son. *See Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) ("A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest."). Plaintiff may dispute the veracity of those statements, but she does not dispute that they were made. Nor does she dispute the fact that Dowell observed injuries on her and her paramour consistent with the statements from those witnesses, nor the fact that the police had been called to their residence more than 20 times in three months. She makes no effort to explain why Dowell should have disregarded witness statements inculpating Plaintiff while Plaintiff's own self-serving explanation—that her dogs gave her black eyes—should stop the investigation in its tracks. To be clear, once more, the Court is not weighing evidence to choose between these competing narratives, because it need not do so to conclude that Plaintiff's theory—that her proclamation of innocence vitiated Dowell's probable cause to arrest her—is meritless as a matter of law. *See id.* at 371 ("[L]aw enforcement is under no obligation to give any credence to a suspect's story [or alibi] nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation.").

[19] Plaintiff also points out that Defendant Dowell turned off his body camera during the arrest, arguing that such conduct "is strong evidence of an attempt to conceal the alleged lack

Similarly, Plaintiff has failed to state a claim for First Amendment retaliation. Under Count IV of her supplemental complaint, Plaintiff alleges that her arrest and the initiation of the juvenile court proceedings "occurred in retaliation for Plaintiff protesting law enforcement's treatment of [her] partner," citing *Hartman v. Moore*, 547 U.S. 250 (2006) for support. Doc. 53-1, # 1410. *Hartman* stands for the proposition that a claim for retaliation requires the claimant to "plead and prove" the absence of probable cause for the adverse action. Because Plaintiff has failed to plausibly allege (i.e., sufficiently plead) a lack of probable cause, this claim fails as well.

### 2. Ehrhart & Parrish.

As to Defendant Ehrhart, an attorney for MCJFS, the second amended complaint alleges that she "misrepresented facts to the court, failed to disclose licensing violations regarding [MYSA], and obstructed access to due process by approving and submitting fraudulent case plans and filings." Doc. 22-1, # 684. In her supplemental complaint, Plaintiff alleges that Ehrhart, while acting under color of law, "participated in ex parte hearings, misrepresented facts to the court, and supported unlawful agency discretion over court-ordered visitation and conditions." Doc. 53-1, # 1406. As to Defendant Parrish, Plaintiff alleges in her supplemental complaint that Parrish "initiated and perpetuated false allegations without verified

---

of altercation and probable cause." Doc. 24, # 725. But the only argument that Plaintiff can muster against probable cause is that she told Dowell that no altercation occurred. Regardless, based on the materials before it, the deactivation of Dowell's body camera is not "sufficient factual content to allow the Court to draw a reasonable inference of misconduct." *Id.* at # 727.

evidence, used hearsay to justify interference with parental rights, and failed to provide reasonable efforts prior to removal." *Id.*

These allegations do not suffice to state a claim against either Ehrhart or Parrish. Plaintiff's allegations that these Defendants "misrepresented facts to the court" and "perpetuated false allegations" refer to Plaintiff's central, meritless theory; i.e., that any mention of domestic violence between Plaintiff and her paramour is false because Plaintiff and her paramour denied that any altercation occurred.[20, 21] *See* doc. 53-1, # 1409 (alleging Ehrhart "forwarded false police reports without cause"); *and id.* at # 1407 (alleging police report was falsified by Defendant Dowell "labeling both [paramour] and Plaintiff victim and perpetrator, despite being told by both Plaintiff and [paramour] that no altercation had occurred."). But Ehrhart and Parrish are entitled to absolute immunity for "conduct intimately associated with the judicial process," even if such conduct included "**intentional misrepresentations** to the juvenile court in the complaint and affidavits." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 725 (6th Cir. 2011) (emphasis supplied).

---

[20] These alleged misrepresentations appear to form the basis of Plaintiff's theory that the juvenile court proceedings were *void ab initio*. Indeed, many of Plaintiff's allegations derive from this central premise, amplified by her extremely loose, snowballing conception of causation and liability (e.g., alleging Ehrhart "supported unlawful agency discretion"). However, Plaintiff expressly articulated her *void ab initio* theory for the first time in her response in opposition to Defendants' motion for judgment on the pleadings. Hence, the Court addresses this theory below.

[21] Plaintiff also claims that allegations of family violence were "false" because of the dismissal of the related abuse, neglect, and dependency proceeding against her paramour. But that dismissal (which occurred months after the juvenile court made findings about family violence in Plaintiff's case) did not preclude the juvenile court from considering concerns of family violence from, e.g., Defendant Dowell, Defendant Jones, Defendant Ehrhart, the Guardian *ad litem*, A.W., the attorney appointed on behalf of A.W., the counselor who met with A.W., and Plaintiff's mother.

Plaintiff's most recent pleading has omitted the allegation that Ehrhart failed to disclose licensing violations regarding MYSA, and thus the Court considers that claim abandoned. Regardless, Plaintiff has not pleaded any facts which would establish an affirmative duty for Ehrhart to disclose licensing violations. Finally, the allegation that Ehrhart "supported unlawful agency discretion over court-ordered visitation and conditions," does not state a claim for relief. To the extent she is alleging that the discretion is "unlawful" because the agency relied on reports of domestic violence, this allegation is impotent for the reasons discussed. To the extent that this allegation signals a broadside attack on the overall delegation of such discretion to the agency, it is overly vague and unsupported.[22] Plaintiff has failed to state a claim against Defendant Ehrhart or Defendant Parrish.

### G. Plaintiff Fails to State a Claim Under Several Federal Statutes.

The Magistrate Judge recommended dismissal of claims brought under certain statutes, including 42 U.S.C. § 12132 (Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1985 (conspiracy), 42 U.S.C. § 671(a)(15), 42 U.S.C. § 5106a (Child Abuse Prevention and Treatment Act ("CAPTA"), the Family First Prevention Services Act ("FFPSA"), and 18 U.S.C. §§ 241-242 (criminal statute prohibiting conspiracies to infringe on federal rights and the deprivation of rights under color of law). Plaintiff objects to all such recommendations. However, her supplemental

---

[22] Regardless, Plaintiff has only alleged that Ehrhart "supported" the allegedly unlawful discretion. Elsewhere in her supplemental complaint, Plaintiff alleges that Defendant Brammer, the (absolutely immune) magistrate judge, "delegated judicial authority to CPS." Doc. 53-1, # 1406. How Plaintiff imputes this judicial act to Ehrhart is unclear.

complaint contains no reference to the ADA, CAPTA, FFPSA, or 18 U.S.C. §§ 241-242 and thus the Court considers those claims abandoned. Regardless, Plaintiff has provided no reason in her objections to reach a different conclusion as to the referenced statutes.[23]

Plaintiff's supplemental complaint retains a single reference to 42 U.S.C. § 1985, though she does not plead a standalone conspiracy claim. However, neither her objections nor her subsequent pleadings save her conspiracy claims from the fatal deficiencies identified by the Magistrate Judge. The R&R states:

> Plaintiff similarly fails to state a claim for conspiracy under 42 U.S.C. § 1985. "It is well settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983. That pleading standard is relatively strict." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563 (6th Cir. 2011) (cleaned up). **Plaintiff's allegations of conspiracy are limited to a conclusory assertion that unspecified "Judicial officers" "refused to process Plaintiff's criminal complaints regarding custodial interference, violating 42 U.S.C. § 1985 (Conspiracy to Interfere with Civil Rights)."** (Am. Compl. ¶ 24, ECF No. 8.) As noted above, judicial officers are immune from suit. Moreover, "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Thus**, the fact that judicial officers followed the law in refusing to process criminal complaints brought by a private citizen can hardly constitute evidence of a conspiracy against that private citizen.**

---

[23] As to the ADA, Plaintiff merely cites A.W.'s diagnoses of certain conditions which are "recognized disabilities" under the ADA, and states, without support, that "the claim under the ADA" (not included in her latest pleading) "relates to the failure to provide appropriate accommodations or services for these disabilities, or discrimination based on them." Doc. 24, # 727. As to the CAPTA, FFPSA, and 18 U.S.C. §§ 241-242, Plaintiff concedes that such statutes create no private rights of action, and thus she purports to reference them solely "as establishing standards of conduct and federal mandates." *Id.* at # 729.

[27]

> As a result, the Complaint fails to allege a plausible conspiracy claim. See *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (to support a conspiracy theory, a plaintiff must show, in part, "that an overt act was committed in furtherance of the conspiracy that caused injury to the [plaintiff]"); see also *Moldowan v. City of Warren*, 578 F.3d 351, 395 (6th Cir. 2009) (finding conclusory factual allegations insufficient to state a § 1985 conspiracy claim)

Doc. 23, # 705 (emphasis supplied). In her objections, Plaintiff merely repeats the conclusory allegations that the R&R rejected, and which her materials do not support. Setting aside the fact that her most recent pleading does not state a claim for conspiracy, any such claim would only survive alongside another viable claim alleged against more than one individual. *See Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009). Plaintiff has failed to adequately plead a conspiracy claim.

Plaintiff has also failed to plead a claim under the Racketeer Influenced and Corrupt Organizations Act (a "RICO" claim). Under Count VI of her supplemental complaint, Plaintiff alleges that "all" Defendants "[e]ngaged in ongoing pattern of activity involving mail fraud, wire fraud, falsification of records, and deprivation of rights under color of law to obtain federal funds and justify agency actions." Doc. 53-1, # 1410. For support, she cites 18 U.S.C. §§ 1961-1968, i.e., the entire RICO chapter of the United States Code. Plaintiff makes no effort to support her conclusory claims, and no Defendant could reasonably apprehend the nature of such sparse allegations brought against them.

In her supplemental complaint, Plaintiff adds a claim for "Privacy Act Violations," citing to 5 U.S.C. § 552a. Doc. 53-1, # 1410. The basis for this claim is

Plaintiff's allegation that Defendants Jones, Sturts, and MCJFS wrongfully disclosed Plaintiff's and A.W.'s social security numbers to a "a third-party facility without necessity or consent." Doc. 53-1, # 1410. But, to the extent the Privacy Act provides a private right of action, it does so only against agencies of the federal government. *See* 5 U.S.C. § 551(1). Therefore, this claim fails as well.

Similarly, Plaintiff alleges that various Defendants "unlawfully withheld" records. Plaintiff's pleadings suggest that she has in fact received the records requested: "[Defendants] withheld all medical, therapy, and educational records **until after multiple demand letters were sent.**" Doc. 53-1, # 1408 (emphasis supplied). Nevertheless, her prayer for relief includes a "full release of CPS file and A.W.'s medical/educational records." *Id.* at # 1411. Plaintiff has not cited any authority nor otherwise established that she has a right to the records she seeks, that any Defendants have an affirmative duty to produce the records she seeks, or that this Court can redress her alleged injuries. Typically, suits seeking the production of public records proceed on statutory authority, such as Ohio's Public Records Act, Ohio Rev. Code Ann. § 149.43 (West), rather than any constitutional basis. *See McBurney v. Young*, 569 U.S. 221, 232 (2013) ("This Court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws."). The appropriate remedy for alleged violations of Ohio's Public Records Act is to seek a writ of mandamus, requiring the petitioner to "prove by clear and convincing evidence a clear legal right to the record and a corresponding clear legal duty on the part of the respondent to provide." *State ex rel. Griffin v. Sehlmeyer*, 2021-Ohio-1419, 165

Ohio St. 3d 315, ¶ 10. Plaintiff need not meet this standard of proof at the pleading stage, but neither would it be accurate to state that she has plausibly stated a claim based on the vague allegations that various Defendants withheld records. That Ohio's Public Records Act expressly excludes "records maintained by the department of job and family services" certainly does not help. Ohio Rev. Code Ann. § 149.43(A)(1)(o) (West).

Finally, Plaintiff has not plausibly alleged a failure-to-protect claim. Count VII of her supplemental Complaint alleges "Failure to Protect (State-Created Danger Doctrine)" against MCJFS, Jones, Sturts, Parrish, MYSA, and KKS. Doc. 53-1, # 1410. Plaintiff alleges that these Defendants "[k]nowingly placed child in violent and unsafe environments[,] failed to respond to reports of abuse" and "abandoned child in unfamiliar location without supervision." *Id.* For legal support, she cites *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989). As alleged, A.W. would be the injured party, but Plaintiff does not purport to bring this claim on his behalf. Therefore, Plaintiff lacks standing for this claim as pleaded. The listed Defendants pose further impediments to this claim; as discussed above, a state agency such as MCJFS can only be liable under a *Monell* theory, which Plaintiff has failed to establish. Furthermore, MYSA and KKS are private facilities, and Plaintiff has not discharged her burden to plausibly allege that they are state actors subject to liability under § 1983. *See Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003) (in determining whether private action should be attributed to state, "the court conducts a historical analysis to determine whether the party has engaged in an

[30]

action traditionally reserved to the state, and the plaintiff bears the burden of making that showing."). Lastly, to the extent that the failure-to-protect allegations against Parrish, Jones, and Sturts are based on their allegedly false statements to the juvenile court,[24] they are entitled to absolute immunity for their "conduct intimately associated with the judicial process." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 725 (6th Cir. 2011).

## H. Conclusion as to Initial Screening and Subsequent Pleadings

The Court **ADOPTS** the R&R and **OVERRULES** Plaintiff's objections to the same. Furthermore, the Court finds that the amendments proffered by Plaintiff would be futile, and any new claims therein meritless, and therefore her motion for leave to file a second amended complaint (doc. 22) and her motion for leave to file a supplemental complaint (doc. 41) (which the Court construes as another motion for leave to amend) are both **DENIED**.

## II. Defendants' Motion for Judgment on the Pleadings.

Plaintiff's claims against Chris Jones and Tara Sturts, both social workers with MCJFS, were the only claims which survived the Magistrate Judge's initial screening. Doc. 23. However, Jones and Sturts have since filed a motion for judgment on the pleadings, arguing that Plaintiff has no viable claim against them. The Court agrees.

---

[24] There appears to be no other connection alleged between these Defendants and the private facility Defendants, with the exception of Jones, who is alleged to have "arranged unlicensed placements." Doc. 53-1, # 1406. *But see sub., § II* (holding Jones is entitled to qualified immunity for actions distinct from the judicial process).

The Magistrate Judge recommended that Plaintiff could proceed "on her claims for violation of her Fourteenth Amendment due process rights" against Jones and Sturts based on the allegation that Jones "removed Plaintiff's minor child from her custody without a valid court order" on March 23, 2024, and that Sturts, his supervisor, "authorized the unlawful removal." Doc. 23, # 700. In subsequent pleadings, Plaintiff has alleged that Jones "[d]irectly ordered unlawful drug tests, withheld medical and educational records, arranged unlicensed placements, [and] denied visitation." Doc. 53-1, # 1406. And she has alleged that Sturts "withheld Plaintiff's access to medical records, falsified entries in SACWIS[25] to suggest parental consent to state custody, and permitted placement in an unlicensed juvenile detention center." Doc. 22-1, # 684. Much of Plaintiff's allegations appear to derive from her central contention that the juvenile court proceedings were *void ab initio*.[26] Doc. 64, # 1510. Plaintiff bases this contention on what she perceives to be procedural irregularities (*but see supra*, § I.B) and her position that Jones, Sturts, and others[27]

---

[25] SACWIS refers to the Statewide Automated Child-Welfare Information System.

[26] For example, Plaintiff alleges that, on April 4, 2024, Jones "ordered an invasive drug test on [A.W.] without parental consent, a court order, or statutory authority." Doc. 53-1, # 1408. This allegation appears to be patently false, given the juvenile court's grant of temporary custody to MCJFS the previous day, which would give Jones all the authority that Plaintiff claims he lacked. Only by adopting Plaintiff's view of the proceedings as *void ab initio* can this allegation appear to have any basis in fact. Thus, because Plaintiff's *void ab initio* premise is wholly nonviable for the reasons discussed herein, her many derivative claims wash out with it.

[27] As noted above, while the motion for judgment on the pleadings is filed solely on behalf of Defendants Jones and Sturts, much of their argument is more broadly applicable, with regard to the factual allegations (e.g., no unlawful removal occurred on March 23, 2024), the parties (e.g., entitlement to immunity), and Plaintiff's legal theories (e.g., that the juvenile court proceedings were *void ab initio*).

misrepresented facts to the court. But the materials before this Court do not support Plaintiff's claims, and the relevant case law dooms them.

First, as the Morrow County Defendants point out in their answer—and as corroborated by Plaintiff's own materials—MCJFS neither sought nor obtained custody of A.W. on March 23, 2024. Doc. 47, # 1136; doc. 47-3; doc. 1-12. Rather, on that date, when Plaintiff and her paramour were arrested on reports of domestic violence, Defendant Chris Jones wrote up a voluntary safety plan, pursuant to Ohio Admin. Code 5180:2-37-02, which provided that A.W. would reside with his grandmother (Plaintiff's mother), Danielle Owens. Doc. 1-12, # 39-40. Plaintiff gave verbal approval of the safety plan that same day after she was released on bond. *Id.* Though Plaintiff repeatedly emphasizes that she "never signed a case plan," (doc. 24, # 716), she does not appear to deny giving *verbal* approval to the safety plan. *See, e.g.*, doc. 1-12, # 40 (safety plan noting time of Plaintiff's verbal approval). Regardless, even if Plaintiff contends that she did not give verbal approval, the Safety Plan expressly states the voluntary, nonbinding nature of its provisions: "Your decision to sign this safety plan is voluntary. The custody of your child(ren) does not change under this safety plan… If you cannot or will not continue following the plan, Children Services may have to take other action(s) to keep your child(ren) safe." Doc. 1-12, # 99. Simply put, to the extent Plaintiff alleges that the wrongful removal occurred on March 23, 2024, such allegation is readily disproven by her own materials. To the extent that she contends that her consent to the Safety Plan was the product of coercion, the "inherently coercive" choice between consenting to a

voluntary safety plan or risking formal removal proceedings is of no constitutional import. *See Smith v. Williams-Ash*, 520 F.3d 596, 600 (6th Cir. 2008) (citing *Dupuy v. Samuels*, 465 F.3d 757 (7th Cir.2006)).

Beyond her lack of basic factual support, case law in this circuit makes clear that Plaintiff's claims cannot proceed. In *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716 (6th Cir. 2011), the Sixth Circuit analyzed similar claims challenging Ohio juvenile court proceedings under the Fourteenth Amendment. The plaintiff-father in *Pittman* alleged that he was "deprived… of his fundamental liberty interest in maintaining a parental relationship" with his child because the social worker on the case made repeated misrepresentations to the juvenile court. *Id.* at 723. The Sixth Circuit rejected his claims on numerous bases relevant to the instant action.

First, the panel held that the social worker defendant was entitled to absolute immunity for "conduct intimately associated with the judicial process," even if such conduct included "**intentional misrepresentations** to the juvenile court in the complaint and affidavits." *Id.* at 725 (emphasis supplied); *see also Salyer v. Patrick*, 874 F.2d 374, 378 (6th Cir. 1989) ("[F]amily service workers [are] absolutely immune from liability in filing [a] juvenile abuse petition, due to their quasi-prosecutorial function in the initiation of child abuse proceedings."). Second, the panel held that, to the extent the plaintiff-father's claims implicated conduct *distinct* from the judicial process, the defendant-social worker was nevertheless entitled to qualified immunity, because she "neither caused [the alleged] deprivation nor interfered with the process

[34]

due upon that deprivation." *Id.* at 728. Third, regarding the plaintiff-father's substantive due process claim, the panel observed that "the juvenile court has ultimate decision[-]making power with respect to placement and custody," and thus the social worker was not responsible for any alleged constitutional deprivation arising therefrom. *Id.* at 729. And fourth, regarding the plaintiff-father's procedural due process claim, the panel reached a similar conclusion, noting that "it is the juvenile court's responsibility to ensure that [plaintiff] received adequate notice of the custody proceedings." *Id.* at 730.

The panel's repeated references to the juvenile court as the responsible actor in *Pittman* are not to identify the court as the proper defendant for the plaintiff-father's due process claims; rather, such references illustrate the basic presumption that state courts are competent tribunals capable of providing the process that is due. *See, e.g.*, *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 483, n.16 (1983) ("We have noted the competence of state courts to adjudicate federal constitutional claims."); *cf.* doc. 65, # 1533-34 ("If Plaintiff did not like the determination made at the shelter care hearing, her [proper] remedy was to object and appeal through the Morrow County Juvenile Court"). That presumption is, of course, anathema to Plaintiff's due process claims, which rely on her conclusory statement that the juvenile court proceedings were *void ab initio*. But, as Defendants point out, the validity of the state court proceedings is not for Plaintiff to determine, and to the extent that she seeks to have this Court declare the proceedings *void ab initio*, her action is barred by the *Rooker-Feldman* doctrine.

[35]

The *Rooker-Feldman* doctrine provides that "a United States District Court has no authority to review final judgments in state court judicial proceedings." *Feldman*, 460 U.S. at 483. Though the Supreme Court has recognized a distinction between a challenge to a final state court judgment and a general challenge to the constitutionality of a state law or rule, this Court does not have jurisdiction to adjudicate claims which are "inextricably intertwined" with state court judicial proceedings. *Id* at 486-87; *see also id.* ("[U.S. District Courts] do not have jurisdiction… over challenges to state court decisions… even if those challenges allege that the state court's action was unconstitutional.").

Plaintiff's claims, including her Fourteenth Amendment due process claims against Jones and Sturts, are "inextricably intertwined" with the state court proceedings. "Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987) (Marshall, J., concurring).

Neither has Plaintiff articulated any other cognizable claim against Jones and Sturts. Plaintiff's allegations of "withheld records" are vague and conclusory, without any reference or argument as to why Jones or Sturts (or any other Defendants) have any legal responsibility to provide the records (or what the records are).[28] Same with

---

[28] Again, this appears based on Plaintiff's theory that the juvenile court orders were *void ab initio*, thus tainting any action taken upon their authority. Furthermore, the only authority Plaintiff cites regarding records disclosure is the Privacy Act, 5 U.S.C. § 551(1). As noted above, to the extent the Privacy Act provides a private right of action, it does so only against agencies of the federal government.

Plaintiff's attempts to impute liability to Jones and Sturts for the allegedly lapsed license at MYSA, the facility where A.W. was placed in October 2024. Plaintiff's allegation that Sturts "falsified entries in SACWIS" is likewise unsupported and conclusory, and Plaintiff has alleged no harm from her inclusion on the confidential registry, nor has she described any attempt to appeal the substantiated finding. Alternatively, like the Sixth Circuit concluded in *Pittman*, to the extent that Plaintiff's claims implicate conduct distinct from the judicial process, Jones and Sturts are nevertheless entitled to qualified immunity, because they "neither caused [the alleged] deprivation nor interfered with the process due upon that deprivation." *Id.* at 728.

In sum, Plaintiff has not plausibly alleged claims against Jones and Sturts upon which relief can be granted. Her claims are vague, conclusory, unsupported by the factual allegations, and unrecognizable as a matter of law. Therefore, Defendants' motion for judgment on the pleadings is **GRANTED**.

## CONCLUSION

For the reasons set forth above, the Court **ADOPTS** the recommendations of the R&R (doc. 23) and **OVERRULES** Plaintiff's objections (doc. 24). Therefore, the Court **ORDERS** that all claims in Plaintiff's first amended complaint (doc. 8) be **DISMISSED**, with the exception of Plaintiff's due process claims against Defendants Jones and Sturts. However, the Court **GRANTS** Defendants' motion for judgment on the pleadings (doc. 63) as to those claims. The Court further **GRANTS** Defendants' motion to strike (doc. 72). The Court **DENIES** Plaintiff's motion for leave to file a

second amended complaint (doc. 22) and Plaintiff's motion for leave to file a supplemental complaint (doc. 41), which the Court construes as a motion for leave to amend for a third time, finding that the amendments proffered would be futile.

Because this order disposes of all of Plaintiff's claims and terminates the case, additional motions currently pending are **DENIED** as moot.[29]


**IT IS SO ORDERED**.


s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: October 31, 2025

---

[29] To wit, Plaintiff's motion to reinstate defendants (doc. 33), motion to compel (doc. 45), motion to strike (doc. 49), and motion for discovery (doc. 68).

[38]